# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 21-MJ-3697 |
| THE PREMISES LOCATED AT: | ) |
| 6239 Beck Avenue, Apt. B112, North Hollywood, CA 91606 | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*The persons identified in Attachments A-1 and A-2, and the items specified in Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail and Wire Fraud |
| 18 U.S.C. § 1956 | Money Laundering and Money Laundering Conspiracy |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Alexander E. Murray*
_____
*Applicant's signature*

Alexander E. Murray, FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Honorable Gail Standish
_____
*Printed name and title*

AUSA: Ali Moghaddas

<u>**ATTACHMENT A-3**</u>

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is located at 6239 Beck Avenue, Apt. B112, North Hollywood, CA 91606 (the "SUBJECT RESIDENCE"). The SUBJECT RESIDENCE is further described as an apartment unit in a building labeled "Beck Park Apartments Building B 6239 Beck Avenue" above its entrance as depicted below.  The SUBJECT RESIDENCE is labeled "112" on its door, as also depicted below.





**ATTACHMENT B**

ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy to commit mail and wire fraud), 1956 (money laundering and money laundering conspiracy) and 371 (conspiracy) as they relate to grandparent scams, unemployment benefit fraud, and proceeds of such fraud schemes (collectively, the "Subject Offenses"), namely:

a.   Records, documents, programs, applications, or materials, referring to, constituting, or containing:

i.   Personally identifying information, including social security numbers, ages, dates of birth, addresses, telephone numbers, credit and debit card information, and bank or other financial institution information;

ii.   Notes, ledgers, envelopes, and packaging materials relating to receipt of cash, money orders, checks, gift cards, or wire transfers (including by money services businesses such as Western Union or MoneyGram), or to the transmittal or receipt of cash, money orders, checks, or wire transfers;

iii. Complaints alleging fraud, materials relating to currency reporting requirements, communications from law enforcement officials, or communications from or with financial institutions or money services businesses concerning financial transactions;

iv.   Financial statements; records of income; international transfers of money; wire transfers; cash deposits; Western Union, MoneyGram, or other money transfer agents;

v.   Correspondence, diaries, address books, or notes relating to elderly victims;

vi.   Communications with co-conspirators in any scheme relating to defrauding elderly victims, and/or concerning the transfer and receipt of funds;

vii. Evidence of assets and funds acquired or owned on or after November 1, 2019;

viii.   Prepaid credit or debit cards, gift cards, or iTunes store cards;

ix.   United States currency;

x.   Public storage units and keys to such units, safety deposit boxes or their keys, or Commercial Mail Receiving Agencies;

xi.   Documents, records, and car keys relating to or reflecting rental car agreements or the use of rental and/or peer-to-peer car sharing services;

xii. Documents and records showing email and telephone contacts and numbers called since November 2019, such as SIM cards, address books, call histories, and telephone bills;

xiii.   Reference to or use of Voice Over Internet Protocol services or devices, and/or spoofing or masking of phone numbers; and

xiv.  For searches of the premises described in Attachment A-3, indicia of occupancy, residency, use, or ownership of the premise searched, including leases, utility bills, identity documents, and cancelled mail;

b.  Any digital or electronic device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, including telephones, tablets, and laptop computers, and forensic copies thereof.

i.  Evidence showing indicia of ownership or use of any digital or electronic device seized pursuant to this warrant.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

4.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

5.    This search warrant does not authorize the search of any digital or electronic device seized pursuant to the above provisions.

### AFFIDAVIT

I, Alexander E. Murray, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of applications for warrants to search the persons of ANAJAH GIFFORD and TIMOTHY INGRAM ("**SUBJECT PERSONS**"), as described more fully in Attachments A-1 and A-2.

2.    This affidavit is also made in support of an application for a warrant to search the premises located at 6239 Beck Ave., Apt. B112, North Hollywood, CA 91606 ("**SUBJECT RESIDENCE**"), as described more fully in Attachment A-3.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy to commit mail and wire fraud), 1956 (money laundering and money laundering conspiracy), and 371 (conspiracy) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1 through A-3 and Attachment B are incorporated herein by reference.

4.    The requested search warrant for the **SUBJECT RESIDENCE** also seeks authorization to search for GIFFORD and INGRAM, each a person to be arrested.  (See arrest warrants for GIFFORD and INGRAM attached hereto as Exhibits 1 and 2, respectively.)

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

1

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates are approximate.

## II. <u>BACKGROUND OF AFFIANT</u>

6.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 3, 1996.  I am assigned to the FBI San Diego Field Office, North County Resident Agency.  Before becoming a Special Agent, I received a bachelor's degree in sociology from the University of Virginia in 1987.  I also served for nearly seven years as a Warrant Officer in the U.S. Army.  While working as a Special Agent, I have attended many types of training courses, beginning with a 16-week FBI new agents' class, during which I received instruction on various aspects of federal investigations.  I have also received specialized training related to internet-facilitated fraud, white-collar crimes, and other types of criminal violations.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    Since July 2020, the FBI San Diego Field Office has been investigating a fraud scheme commonly known as a "grandparent scam," in which elderly victims are contacted, generally via telephone, and made to believe their grandchild or other relative is in trouble and needs money.  In some

2

circumstances, the subjects impersonate the victim's relative. The elderly victims are convinced their "grandchild" has been arrested and needs bail money to get out of jail; additional money may later be collected for "attorney's fees" or other costs. The criminal organizations running these scams can be wide-ranging, with victims in multiple states and co-conspirators across the country and overseas.

8. This investigation focuses on a criminal enterprise conducting a grandparent scam with numerous victims located in the Southern District of California. The investigation to date revealed that the criminal enterprise obtains money from its victims through three primary means: (1) picking up cash directly from the victims; (2) inducing the victims to wire money to various bank accounts across the country; and (3) getting the victims to send cash through the mail or other interstate carrier. Members of the criminal organization also recruit third parties to receive money from victims, including through the use of various social media applications.

9. As part of this investigation, on July 28, 2021, a federal grand jury in the Southern District of California returned a one-count indictment charging GIFFORD and INGRAM, among other defendants, with racketeering conspiracy. Arrest warrants were issued for GIFFORD and INGRAM. As discussed below, the investigation remains ongoing, based in part on probable cause to believe that criminal conduct by GIFFORD and INGRAM likewise continues. There is also probable cause to believe that GIFFORD and INGRAM, along with evidence of their

3

ongoing criminal conduct, will be found at the **SUBJECT RESIDENCE**.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   **Indictment of GIFFORD and INGRAM**

10.   On July 28, 2021, a federal grand jury in the Southern District of California returned a one-count indictment charging eight defendants, including GIFFORD and INGRAM, with violating Title 18, United States Code, Section 1962(d), for conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity between November 1, 2019 and October 14, 2020.  (SD Cal. Case No. 21-cr-2216.)  The indictment charges that GIFFORD and INGRAM committed numerous overt acts in furtherance of the conspiracy, including coordinating the pickup and receipt of fraudulently obtained money from multiple grandparent scam victims.  The arrest warrants remain pending for GIFFORD and INGRAM (Exs. 1 and 2), who appear to be romantic partners.

### B.   **GIFFORD and INGRAM at the SUBJECT RESIDENCE**

11.   On or about August 5, 2021, I and other investigators conducted surveillance in the vicinity of the **SUBJECT RESIDENCE** (the "August 5 surveillance").  The **SUBJECT RESIDENCE** is part of an apartment complex, the Beck Park Apartments.  The complex has two buildings, one labeled 'A' and one labeled 'B' above the respective entrance.  The photographs in Attachment A-3 were taken by investigators from outside and in the common first-floor hallway of Building B.

12.   During the August 5 surveillance, investigators saw GIFFORD exit Building B at approximately 4:00 p.m. walking a dog.  I learned from other investigators that surveillance in July 2021 placed INGRAM walking the same dog in the same area. Furthermore, the **SUBJECT RESIDENCE** was INGRAM's listed address with the California Employment Development Department ("EDD"), according to records obtained in September 2020.  Investigators, however, did not see INGRAM on August 5, 2021, and did not have a search warrant for the **SUBJECT RESIDENCE.**  Due in part to other information learned during the surveillance operation as discussed below, I did not arrest GIFFORD at that time and am applying for these search warrants to execute forthwith.

13.   Furthermore, GPS location information for cellular telephones believed to be used by GIFFORD and INGRAM is consistent with GIFFORD and INGRAM being located at the **SUBJECT RESIDENCE.**  On August 3, 2021, the Honorable Gail Standish signed a warrant, in Case No. 21-MJ-3584, authorizing the search and seizure of GPS location information for two cellular telephones believed to be used by GIFFORD and INGRAM.  GPS information obtained thus far is consistent with GIFFORD and INGRAM residing at the **SUBJECT RESIDENCE.**  For example, GPS location information from the time of the August 5, 2021 surveillance that saw GIFFORD outside the **SUBJECT RESIDENCE** placed both phones in the vicinity of the **SUBJECT RESIDENCE.** Although investigators did not see INGRAM then, the information is also consistent with the two cellular telephones being in the possession of two different users.  For example, location

information on or about August 4, 2021, showed one of the phones traveling to Oceanside, California while the other phone remained in the Los Angeles area, then both phones were in the vicinity of the **SUBJECT RESIDENCE** overnight into August 5, 2021. At other times, both phones were overnight in the vicinity of Normandie and Melrose Avenues in Los Angeles.

    C.    **Continuing Criminal Conduct**

        1.   "Money Plays"

14. I learned from another FBI agent that investigators had interviewed money mule Juvahn Victoria ("Victoria") on May 19, 2021. Among other things, Victoria discussed during the interview knowing GIFFORD, meeting "Bleezy," whom investigators know to be INGRAM, in spring of 2020, and receiving wire transfers for GIFFORD. According to Victoria, shortly after receiving a transfer for GIFFORD in the amount of $60,000, Victoria began receiving phone calls from GIFFORD and "Bleezy," threatening Victoria that they would "send the mafia after" her to get her to withdraw the money from her account and pass it to them. Victoria instead cancelled the incoming $60,000 wire, which investigators had previously traced as having originated directly from, and as having been fraudulently induced from, an elderly victim of the above-described grandparent scam in Maryland.

15. On May 26, 2021, federal investigators and prosecutors interviewed Victoria a second time. During the interview, Victoria provided investigators with additional information she had not disclosed during her first interview:

a.   In May 2020, prior to receiving the first wire
transfer, Victoria had a video call with GIFFORD and another
female.  During the call, GIFFORD told Victoria that she had
several ways of making money, and all Victoria needed to do to
get paid was accept incoming wires and withdraw the cash.

b.   In or around January 2021, Victoria was dining
with a friend at a restaurant in Los Angeles when she saw
"Bleezy."  "Bleezy" approached her and told Victoria she had
messed up his "money play" and that he'd been looking for her.
A few days later, "Bleezy" contacted Victoria by video chat and
told her she needed to do another transaction, because she owed
him for canceling the $60,000 wire.  Victoria agreed and
provided "Bleezy" with the bank account information for her
JPMorgan Chase account.

c.   After approximately $30,000 was sent to her
account, "Bleezy" told Victoria to withdraw the money at four
different branches in specific increments.  Victoria then met
"Bleezy" in a parking lot to give him the money.  During the
meeting, "Bleezy" told Victoria she had to do another
transaction to make up for the earlier $60,000 wire.  Victoria
opened up another bank account, but subsequently broke off
communication with "Bleezy."

d.   "Bleezy" made further attempts to contact
Victoria by phone, but she did not answer his calls.  Victoria
admitted that she was still in contact with GIFFORD via
Instagram, and shared her messages with GIFFORD with the
investigators.  On April 21, 2021, GIFFORD sent a message from

her Instagram account, vanity name "meiliinng_," to Victoria, saying "also i still do tht other stuff if u kno anyone interested sorry abt how it went last time w us too." Victoria explained that she understood this message to mean that GIFFORD is still engaged in money transactions.

16. Records received from JPMorgan Chase show that on or about January 14, 2021, a check in the amount of $34,000 was deposited into an account that was opened on or about December 26, 2020, in the name of Juvahn Victoria. On January 15, 2021, Victoria made a series of withdrawals, in the amounts of $9,200; $9,250; $8,520; $6,000; and $1,000. The check was later determined by the bank to be fictitious.

17. On June 17, 2021, investigators obtained a federal search warrant for GIFFORD's Instagram account, registered under vanity name "meiliinng_". According to the Instagram records, GIFFORD used her Instagram account, as recently as April 2021, to recruit additional individuals to participate, either knowingly or unknowingly, in the criminal scheme. GIFFORD communicated with several individuals between December 2020 and April 2021, asking them if they are interested in "plays" or "money moves." She also told them to download encrypted messaging applications such as Telegram or Wickr. Based on my training, experience, and knowledge of the facts of this case, I believe that "plays" and "money moves" refer to fraudulently obtaining money from elderly or other victims.

18. Furthermore, during the August 5 surveillance, an investigator saw a large UPS envelope in the hallway outside the

door to the **SUBJECT RESIDENCE.**  The envelope was addressed to "Charles R Wodraska" at the **SUBJECT RESIDENCE.**  The listed sender address was a location in Coppell, Texas, and the listed sender telephone number was an "800" number, both of which, according to a search of publicly available information, associated with JPMorgan Chase bank.

19.  On or about August 6, 2021, I identified a "Charles R. Wodraska" born in 1946 and residing in Oklahoma City, Oklahoma. I spoke to Mr. Wodraska by telephone.  He told me the following:

a.  About one month ago, someone walked into a JPMorgan Chase branch in Chicago and presented themselves as Wodraska and tried to close out/cash out his account.  The unknown subject had identification for Wodraska, but the bank employees got suspicious when he could not sign Wodraska's name correctly, and declined to close the account.  Mr. Wodraska learned this information from his local bank branch.

b.  Also, on or about August 4, 2021, someone took over his AT&T cell phone number and transferred it to another carrier.  AT&T is working on getting his cell phone number back.

20.  In my training and experience, I know that banks often use two-factor authentication involving an accountholder's cell phone number to verify identity.  I recognize unauthorized cell phone number transfers to be a means of defeating such a security measure.  Based on the UPS package seen during the August 5 surveillance and the other circumstances discussed herein, there is probable cause to believe that GIFFORD and/or

INGRAM are using the **SUBJECT RESIDENCE** in the commission of fraud and/or money laundering.

       2.   <u>Unemployment Benefit Fraud</u>

    21.  Also during the August 5 surveillance, investigators saw GIFFORD open, review, and discard mail during her dog walk outside the **SUBJECT RESIDENCE**. Investigators then sifted through the trash container used by GIFFORD and recovered what I believe to be the mail discarded by GIFFORD. That mail was an envelope from EDD, addressed to "Brejuana S. Bynum" at the **SUBJECT RESIDENCE**. The contents indicated that the envelope had contained a debit card, but the card had been removed, I believe by GIFFORD.

    22.  These circumstances are consistent with evidence of unemployment benefit fraud found during a prior search warrant execution at a different residence that had been used by GIFFORD and INGRAM. On October 8, 2020, the Honorable Patricia Donohue had signed a warrant (the "October 8 Warrant"), in Case No. 20-MJ-4880, authorizing the search of the premises located at 11508 ½ Emelita St., North Hollywood, CA 91601 for evidence or fruits of grandparent scams. In executing the October 8 warrant on or about October 14, 2020, agents discovered, among other evidence, a handwritten ledger with personally identifiable information of third parties, as well as letter responses from EDD addressed to various individuals and sent to the **SUBJECT RESIDENCE**. The Honorable Maria Audero issued a second warrant to seize, among other things, these items. <u>See</u> In re Search of 11508 ½ Emelita St., 20-MJ-4990 (C.D. Cal. Oct. 14, 2020) (filed under seal).

## V.  <u>USE OF DIGITAL DEVICES IN FINANCIAL CRIMES</u>

23.  I know that people in general, and individuals involved in financial crimes in particular, use digital devices to communicate with coconspirators and to conduct their unlawful activities, and tend to keep their personal digital devices in locations where they are easily located, readily accessible, and close at hand, such as in a pocket, a backpack, a car, or their home.

24.  In this case, digital devices used by numerous conspirators have yielded substantial evidence of their offenses.  Digital devices seized off INGRAM and multiple codefendants in October and November 2020 contained many message threads, screen shots, and other records of their unlawful activity.  Evidence obtained from other sources, like money mule Juvahn Victoria discussed above, included communications of such unlawful activity over mobile applications with GIFFORD.

25.  Due to the likely use of digital devices by the participants in this matter, among other reasons, this application seeks permission to search the **SUBJECT PERSONS** in addition to a search of the **SUBJECT RESIDENCE.**  Because digital devices are considered items of value, as is information on those devices, I know that people in general, and individuals involved in fraud crimes in particular, do not commonly discard their devices or information on their devices when changing residences or even when upgrading or changing devices, but rather, the devices themselves or at least the data on the devices is maintained by such individuals.

11

26.  It is common practice for individuals involved in financial crimes to keep the evidence, fruits, and instrumentalities of their crimes in a place that is private, secure, and easily accessible, such as: (i) a residence or a car; (ii) on or offsite storage units, safes, or lockers; (iii) post office boxes; and/or (iv) boxes, lockers or other space maintained at commercial mail receiving companies.  Onsite and offsite storage, and offsite post office boxes, lockers and other space maintained at commercial mail receiving companies, and other storage facilities are used, among other reasons, for security and anonymity purposes, to maintain records in secure (and potentially anonymous or pseudonymous) locations in the event that property is compromised and/or becomes vulnerable to search or seizure by the government.  Secure and offsite storage can also be used to try to hide evidence associated with criminal activity.

27.  Individuals committing financial crimes use and maintain digital devices to store information about their crimes during and long after the crimes have been committed.  This information includes logs of transactions or browsing history; copies of documents submitted electronically; records of funds received; contacts for co-conspirators; records of locations visited to exchange proceeds of crime; and records of payments to or from co-conspirators.

28.  Individuals who commit financial crimes will often liquidate criminal proceeds to cash or cash equivalents (such as cashier's and traveler's checks, jewelry, or precious metals),

as well as use criminal proceeds to purchase or finance automobiles, real estate, and other types of property and assets, in order to launder the proceeds and profit from the crimes.  Such individuals may also transfer criminal proceeds to, and receive money from, co-schemers and others, including by use of digital funds transfer applications, such as Zelle. Proceeds may also be used to create new companies or investments as part of other potentially fraudulent activity and/or as a means to launder criminal proceeds into legitimate or semi-legitimate businesses.  Information concerning expenditures and purchases, and other financial information concerning income and work activity, is also evidence of criminal activity to the extent that persons involved in criminal activity do not have legitimate sources of income to support expenditures and purchases.

29.  Travel records, such as itineraries, tickets, boarding passes, motel and hotel receipts, passports and visas, and credit card receipts reflecting such travel, are often evidence of financial crimes, as these records can show the use of criminal proceeds and perpetrator's plans and/or wherewithal to leave the jurisdiction.

30.  Individuals who participate in schemes to commit financial crimes often work with co-conspirators with whom they communicate by phone, e-mail, text message, and social media, and the search of digital devices of co-habitants of these schemes can also rule out or tend to negate the possibility that

someone else committed the crime, which is itself evidence of the crime.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

14

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

32.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

       a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

34.  For all the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found through searches of the **SUBJECT PERSONS** and **SUBJECT RESIDENCE** described in Attachments A-1 through A-3, and that the **SUBJECT PERSONS** will be found through a search of the **SUBJECT RESIDENCE.**


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this 10th day of August, 2021.

_____
HONORABLE GAIL STANDISH
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1

AO 442

**SEALED**

# United States District Court
## SOUTHERN DISTRICT OF CALIFORNIA

*PLEASE RECEIPT AND...*

UNITED STATES OF AMERICA

V.

Anajah Gifford (4)

**WARRANT FOR ARREST**

Case Number:  21cr2216-CAB-4

## NOT FOR PUBLIC VIEW

To:   The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest          Anajah Gifford (4)

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☒ Indictment   ☐ Information   ☐ Complaint   ☐ Order of Court   ☐ Violation Notice   ☐ Probation Violation Petition

☐ Pretrial Violation

charging him or her with  (brief description of offense):
18:1962(d) - Conspiracy to Conduct or Participate in an Enterprise Through a Pattern of Racketeering Activity
18:1963 - Criminal Forfeiture

In violation of Title _____ See Above _____   United States Code, Section(s) _____

John Morrill
Name of Issuing Officer

E. Blase

s/ E. Blase
Signature of Deputy

Clerk of the Court
Title of Issuing Officer

July 28, 2021, San Diego, CA
Date and Location

Bail fixed at $ _____ No Bail _____   by _____ The Honorable Michael S. Berg _____

Name of Judicial Officer

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |

# EXHIBIT 2

AO 442

**SEALED**

# United States District Court
### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | **WARRANT FOR ARREST** |
| V. | |
| Timothy Ingram (3), aka "Bleezy" | **Case Number:** 21cr2216-CAB-3 |

## NOT FOR PUBLIC VIEW

To:   The United States Marshal
and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest   Timothy Ingram (3), aka "Bleezy"

Name

and bring him or her forthwith to the nearest magistrate to answer a(n)

☒ Indictment   ☐ Information   ☐ Complaint   ☐ Order of Court   ☐ Violation Notice   ☐ Probation Violation Petition

☐ Pretrial Violation

charging him or her with  (brief description of offense):
18:1962(d) - Conspiracy to Conduct or Participate in an Enterprise Through a Pattern of Racketeering Activity
18:1963 - Criminal Forfeiture

In violation of Title   See Above   United States Code, Section(s)

| | |
|---|---|
| John Morrill | Clerk of the Court |
| Name of Issuing Officer | Title of Issuing Officer |
| s/ E. Blase   E. Blase | July 28, 2021, San Diego, CA |
| Signature of Deputy | Date and Location |

Bail fixed at $   No Bail   by   The Honorable Michael S. Berg

Name of Judicial Officer

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named defendant at | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |